THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed:
June 8, 2007

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

Great Seats, Ltd.
v.
Great Seats, Inc.

_____

Cancellation No. 92032524

_____

Irving M. Weiner of Weiner & Burt, P.C. for Great Seats, Ltd.

P. Jay Hines of Baker & Hostetler LLP for Great Seats, Inc.

_____

Before Seeherman, Grendel and Holtzman, Administrative Trademark Judges.

Opinion by Grendel, Administrative Trademark Judge:

**INTRODUCTION**

Great Seats, Inc., respondent herein,[1] is the record owner of Registration No. 2339519, which is of the mark depicted below

---

[1] As will be discussed more thoroughly *infra*, there have been two corporate entities named "Great Seats, Inc." One "Great Seats, Inc." corporation, formed on March 12, 1997, was the applicant which, on April 21, 1997, filed the application which matured into the registration involved in this proceeding. This corporation ceased to exist on October 7, 1999. (See *infra* at n. 5.) In this decision, we will refer to this corporation as



for services recited in the registration as "ticket agency

services for concerts, theatrical performances, and sporting

events," in Class 35.[2]  The registration includes a claim of

acquired distinctiveness under Trademark Act Section 2(f),

15 U.S.C. §1052(f), as well as a disclaimer of INC. apart

from the mark as shown.  The registration matured from an

application filed on April 21, 1997, which was based on use

in commerce under Trademark Act Section 1(a), 15 U.S.C.

---

"applicant"  or as "GS-1" or as "the '660 corporation."  The
other "Great Seats, Inc." is a corporation which was originally
formed in 1990 as Wholesale Tickets, Inc. ("WTI") and which,
through mesne name changes, became "Great Seats, Inc." on July 7,
1997, after the application filing date.  This corporation
prosecuted the application after the '660 corporation ceased to
exist on October 7, 1999.  It received the registration at issue
in this proceeding on April 11, 2000, and has litigated this
proceeding as respondent.  In this decision, we shall refer to
this second corporation as "respondent" or as "GS-2" or as "the
'410 corporation."
    Respondent, the '410 corporation, is currently the record
owner of the involved registration by virtue of a nunc pro tunc
assignment from the applicant '660 corporation, dated November 4,
2004 (during the course of this proceeding) but assertedly
effective as of October 7, 1999.  Petitioner has challenged the
validity of this assignment and the "standing" of the '410
corporation to act as respondent herein.  However, in view of our
finding (discussed *infra*) that the '410 corporation is and has
been the owner of the involved mark at all times pertinent
herein, we deem the '410 corporation to be the proper respondent
in this case, regardless of the validity of the nunc pro tunc
assignment.  Further with respect to the nunc pro tunc
assignment, see *infra* at footnote 6.

[2] Issued on April 11, 2000.  Affidavits under Sections 8 and 15
filed.

§1051(a), and in which March 1, 1997 was alleged to be the date of first use of the mark anywhere and the date of first use of the mark in commerce.

On June 15, 2001, Great Seats, Ltd., petitioner herein, filed a petition to cancel the involved registration. In its amended petition for cancellation, petitioner alleges as grounds for cancellation that (1) the application from which the registration matured is void ab initio under Trademark Act Section 1 because it was not filed by the owner of the mark, and that (2) the application which matured into the registration is void ab initio due to fraud committed during prosecution of the application, during maintenance of the registration, and during litigation of this proceeding.[3]

Respondent filed an answer to the amended petition to cancel by which it denied the salient allegations thereof and asserted various affirmative defenses, the only one of which it has pursued at trial and in briefing being the equitable defense of unclean hands.

The evidence of record consists of:

---

[3]     As noted *supra* at footnote 1, petitioner also alleges that the respondent '410 corporation lacks "standing" to defend this cancellation proceeding. Even assuming the correctness of petitioner's novel theory that a respondent in a cancellation proceeding must establish its "standing" to defend the case, we find that respondent in fact has such standing given its ownership, or claim of ownership, of the registered mark.

Additionally, petitioner's amended petition to cancel includes a Section 2(d) ground for cancellation, but petitioner has expressly withdrawn such claim. See petitioner's reply brief at pages 9-10. We shall give it no further consideration.

(1) the file of respondent's involved registration;

(2) the pleadings herein;

(3) petitioner's December 21, 2005 notice of reliance on various materials, including:

> (a) the July 15, 2004 discovery deposition of respondent's principal Enrique Daniel Matta, and exhibits thereto (hereinafter "Matta Disc. Depo.");
>
> (b) respondent's Answers to petitioner's Interrogatories and Requests for Admissions (hereinafter "Interrog. No. ___" and "Adm. No. ___");
>
> (c) the file of petitioner's application Serial No. 75733290;
>
> (d) respondent's February 7, 2005 response to petitioner's motion for summary judgment, and the seven exhibits thereto;[4] and
>
> (e) various official records from the USPTO and from the State of Maryland;

---

[4] The Board denied petitioner's motion for summary judgment in an order dated July 15, 2005. We note that evidence submitted in connection with a summary judgment motion is not of record as trial evidence unless it is properly made of record at trial. Normally, summary judgment evidence (and briefs) previously submitted in the case would not be deemed to be "official records" which may be submitted via notice of reliance. However, in its trial brief in this case (at page 1), respondent has stipulated that the evidence of record includes all of the materials submitted via petitioner's notice of reliance. In view of this stipulation, we deem the summary judgment evidence to be of record at trial. We add that the specific findings of fact for which we cite this summary judgment evidence (see *infra*) are supported by other evidence in the record as well.

(4) respondent's March 24, 2006 notice of reliance on various official records and on certain of petitioner's answers to respondent's interrogatories;

(5) the May 1, 2006 testimony deposition of Enrique Daniel Matta and exhibits thereto, taken by petitioner during its rebuttal testimony period (hereinafter "Matta Test. Depo."); and

(6) the May 1, 2006 testimony deposition of Steven H. Oram (respondent's corporate counsel) and exhibits thereto, taken by petitioner during its rebuttal testimony period (hereinafter "Oram Test. Depo.").

The case is fully briefed. After careful consideration of all of the evidence and arguments proffered by the parties, we grant the petition to cancel on the ground that the application which matured into the involved registration was not filed by the owner of the mark and that it therefore is void ab initio under Trademark Act Section 1(a), 15 U.S.C. §1051(a). In view of this decision, we need not and do not reach petitioner's other pleaded claims. Finally, we reject respondent's pleaded "unclean hands" affirmative defense.

**STANDING**

The record establishes that petitioner is the owner of application Serial No. 75733290, filed June 21, 1999, by

which it seeks registration of the mark GREAT SEATS for "arranging for ticket reservations for shows and other entertainment events."  The record also establishes that petitioner's application has been refused registration under Trademark Act Section 2(d) based on respondent's Registration No. 2339519, the registration involved in this cancellation proceeding, and that petitioner's application has been suspended pending the outcome of this proceeding. (Petitioner's notice of reliance, items 4-9; respondent's answers to paragraphs 2 and 3 of the amended petition for cancellation).

In view of these facts, we find that petitioner has established its standing to petition to cancel respondent's involved registration.  *See Cerveceria Modelo S.A. de C.V. v. R.B. Marco & Sons, Inc.,* 55 USPQ2d 1298 (TTAB 2000); *Hartwell Co. v. Shane*, 17 USPQ2d 1569 (TTAB 1990).

**PETITIONER'S §1(a) NON-OWNERSHIP CLAIM**

The record establishes the following facts pertinent to petitioner's §1(a) non-ownership claim.

In 1978, respondent's principal Enrique Daniel Matta (hereinafter Danny Matta or Matta) became involved (as an individual) in the business of selling and brokering tickets for entertainment events.  He eventually acquired the nickname "Great Seats" due to his ability to obtain and sell

6

"great seats" to entertainment events.  (Matta Disc. Depo. at 293-95; Matta Test. Depo. at 29-34.)

In 1990, Matta formed a Maryland corporation named Wholesale Tickets, Inc. (hereinafter WTI), under which he continued in the ticket brokerage business.  The State of Maryland assigned ID No. D3048410 (hereinafter '410) to this corporation.  (Adm. Nos. 1 and 2.)  Danny Matta was named as the president of the corporation, and it appears that in the beginning he was also the sole shareholder of the corporation.  (Matta Disc. Depo., Exh. 1.)  It is not clear how long Matta remained the sole shareholder of the '410 corporation; the record shows only that as of July 7, 2004 the shareholders included Matta and at least three others. (Adm. No. 241.)

In 1994, WTI changed its name to Premier Entertainment, Inc. (hereinafter PE-1).  The renamed corporation retained the '410 Maryland ID number.  (Adm. No. 3; Exh. No. 3 to respondent's summary judgment response.)

In 1995, PE-1 (the '410 corporation) began using the designation GREAT SEATS in its advertising, along with the name Premier Entertainment.  (Interrog. No. 2; Oram Test. Depo. 11-13.)  Use of the GREAT SEATS designation by this corporation (the '410 corporation) apparently has continued to the present time.

On March 12, 1997, Matta formed a second Maryland corporation, naming it "Great Seats, Inc." (hereinafter GS-1 or the '660 corporation). This corporation was assigned ID No. D4635660 (hereinafter '660) by the State of Maryland.[5] Danny Matta was named president and secretary/treasurer of the new corporation, and Danny Matta and his wife Julia Matta were issued all of the corporation's stock, as tenants by the entirety. (Matta Disc. Depo. Exh. 23; Exh. Nos. 6 and 7 to respondent's summary judgment response.)

Explaining the circumstances surrounding the formation of the new '660 corporation, respondent's corporate counsel, Steven Oram, testified as follows (bracketed language is the Board's, inserted for clarity):

> In 1997 Danny [Matta] came to me and said, "I'd like to contemplate changing the name of 'Premier' [the '410 corporation] to "Great Seats, Inc." And he said, "But I need to – we need to make sure that the – that the name works as a marketing device and that it's a good vehicle." And we decided that we would first form "Great Seats, Inc." [the '660 corporation], which is what we did. And he began to see if the reputation that he had gotten in town for having the best or the greatest seats was helped by the – by the name "Great Seats." And he – so that the company we formed in March of '97 [the '660 corporation] was used to reserve the name and to hold the corporate structure, undecided what we were going to do with it.

---

[5] This '660 corporation forfeited its corporate charter by operation of Maryland law on October 7, 1999, a fact which is not pertinent to the issue before us, i.e., whether the '660 corporation owned the service mark as of the April 21, 1997 application filing date.

(Oram Depo. at 9.) The new '660 corporation was "a shell corporation in proper legal existence, formed and in good standing under the laws in the state of Maryland." (Oram Depo. at 16.)

Before and after the formation of the '660 corporation on March 12, 1997, all use and advertising of the GREAT SEATS mark in connection with ticket brokerage services continued to be performed solely by the earlier '410 corporation, and not by the newly-formed '660 corporation. (Adm. Nos. 29-30, 34, and 41.) There is no evidence of any transfer of rights in the GREAT SEATS designation from the prior '410 corporation to the new '660 corporation upon the latter's formation, or at any time thereafter. There is no evidence that the '410 corporation's use of the mark was controlled by the new '660 corporation.

On April 21, 1997, the application (Serial No. 75278703) which matured into respondent's registration involved herein was filed by Great Seats, Inc., the newly-formed '660 corporation which was the only corporation named "Great Seats, Inc." at that time. The application declaration was signed by Danny Matta, as president of "Great Seats, Inc." In the application, the date of first use of the mark and the date of first use of the mark in commerce were alleged to be March 1, 1997, a date prior to

9

the March 12, 1997 formation of the applicant '660 corporation.  This March 1, 1997 date of first use referred to use by the '410 corporation, not to use by the applicant '660 corporation.  (Adm. Nos. 186-87.)

On July 7, 1997, some two and one-half months after the application filing date and nearly four months after the formation of the applicant '660 corporation on March 12, 1997, the corporate name of the applicant '660 corporation was changed from "Great Seats, Inc." to "Premier Entertainment, Inc."  At the same time, the earlier '410 corporation then known as "Premier Entertainment, Inc." changed its name to "Great Seats, Inc."  Thus, the '410 corporation and the '660 corporation effectively switched names on July 7, 1997.  (Adm. No. 27; Exhibit 4 to respondent's summary judgment response.)  After the name changes (as before the name changes, and before the April 21, 1997 application filing date), all use and advertising of the GREAT SEATS mark in connection with the ticket brokerage services recited in the application were performed by the '410 corporation, and not by the applicant '660 corporation.  (Adm. Nos. 29-30, 34, and 41.)

Mr. Matta testified that, notwithstanding his signature on the documents which effected the formation of the '660 corporation on March 12, 1997, he was unaware, prior to this cancellation proceeding, of the formation and existence of

the '660 corporation. He maintains that, to his understanding, he always has had only one ticket brokerage company or business which, although it went through several name changes, remained only one company or business. (See, e.g., Matta Disc. Depo. at 94-95, 133-34, 167, 171-72, 230-31, and 264-69; Matta Test. Depo. at 31-33.) According to respondent, that company began in 1978 as an individual proprietorship, was incorporated in 1990 under the name Wholesale Tickets, Inc., changed its name in 1994 to Premier Entertainment, Inc., and then in July 1997 (after the application filing date) changed its name again to Great Seats, Inc. This in fact is the history of the '410 corporation, as recounted above. However, it does not take into account the formation and existence of the '660 corporation prior to the April 21, 1997 application filing date, nor the fact that it was the '660 corporation, and not the '410 corporation, which filed the application for registration of the mark.

In a use-based application under Trademark Act Section 1(a), only the owner of the mark may file the application for registration of the mark; if the entity filing the application is not the owner of the mark as of the filing date, the application is void ab initio. *See* Trademark Act Section 1(a), 15 U.S.C. §1051(a); Trademark Rule 2.71(d), 37 C.F.R. §2.71(d). This statutory ownership requirement

11

cannot be waived. *Huang v. Tzu Wei Chen Food Co., Ltd.*, 849 F.2d 1458, 7 USPQ2d 1335 (Fed. Cir. 1988). Thus, the issue before us is whether the '660 corporation which filed the application was the owner of the mark as of the application filing date. For the reasons discussed below, we find that it was not; we find, rather, that the owner of the mark as of the application filing date was the actual user of the mark, i.e., the '410 corporation.

As of the April 21, 1997 application filing date, the applicant '660 corporation (which was formed on March 12, 1997) was not itself using and had not used the mark sought to be registered. All use of the mark prior to and as of the filing date was use by the '410 corporation, not the '660 corporation. Therefore, there was no use of the mark by the applicant '660 corporation upon which respondent can rely as a basis for establishing that the '660 corporation was the owner of the mark and thus entitled to file the application for registration of the mark.

Respondent argues, however, that despite the '660 corporation's lack of use of the mark, the '660 corporation was the owner of the mark and the proper applicant for registration. Respondent appears to be basing this contention on two theories, which are somewhat commingled in respondent's brief. First, respondent contends that the '410 corporation and the '660 corporation were merely

12

earlier and later manifestations of the same single continuing commercial enterprise, such that the '410 corporation's use of the mark prior to and as of the filing date in fact constituted use by the '660 corporation. Second, respondent appears to be arguing that even if the '660 corporation and the '410 corporation were two separate entities, they were "related companies" under Trademark Act Section 5, with the '410 corporation's use of the mark prior to the application filing date having been controlled by Mr. Matta, and having inured to the benefit of the applicant '660 corporation. We shall address each of these theories in turn.

Respondent argues that the '410 corporation and the '660 corporation were merely earlier and later manifestations of the same company, such that the application filed by the '660 corporation on April 21, 1997 in fact was filed by the owner of the mark. According to respondent, Matta formed the '660 corporation on March 12, 1997 "out of a desire to change his corporate name to correspond to how he was perceived by the public." (Respondent's brief at 1.) It was Matta's "intention and understanding" that the '660 corporation would "take over the business of" the earlier '410 corporation. (Id. at 6.) The '660 corporation was formed upon the recommendation of Matta's corporate attorneys, but "it was always Mr. Matta's

13

intention and prerogative to operate only one company and to conduct his day to day business through one company." (Id. at 2.) It was Mr. Matta's understanding that the April 21, 1997 application for registration was to be filed by the '410 corporation, but "due to some actions taken by his corporate lawyers, he was actually signing the application on behalf of [the '660 corporation], a corporation he was not aware even existed." (Id. at 7.)

Essentially, respondent appears to be arguing that the application in fact was filed by the actual owner of the mark (the single commercial enterprise comprised of the earlier '410 corporation and the later '660 corporation) albeit in an incorrect name (i.e., in the name of the '660 corporation rather than the '410 corporation). Citing *Accu Personnel Inc. v. Accustaff Inc.*, 38 USPQ2d 1443 (TTAB 1996), and *Gaylord Bros. Inc. v. Strobel Products Co., Inc.,* 140 USPQ 72 (TTAB 1963), respondent contends that its mere misidentification of the '660 corporation as applicant in the application was a curable defect which does not render the application void. We are not persuaded by this argument.

Where there exists as of the application filing date but a single continuing commercial enterprise which is the owner of the mark, and it is that entity which files the application, the application is deemed to have been filed by

14

the owner of the mark even if the applicant, that single commercial enterprise, is misidentified in the application as to its name or entity designation (such as corporation, partnership, etc.).  If the named applicant is merely an earlier or later manifestation of the same single continuing commercial enterprise which is the owner of the mark, a mistake in the manner in which that single entity is identified in the application is not fatal to the application but instead is a curable defect.  *See Accu Personnel Inc. v. Accustaff Inc.*, *supra* (applicant corporation, formed by merger of four separate companies which did not survive the merger, was proper "person" to file the application even if corporation technically did not yet exist on application filing date; the four companies and the corporation constituted earlier and later manifestations of the same single commercial enterprise which was the owner of the mark but which was merely misidentified in the application).  *See also Gaylord Bros. Inc. v. Strobel Products Co., Inc.*, *supra* (for purposes of establishing Section 2(d) priority, defendant corporation which had been formed by an individual who formerly did business under the mark as a sole proprietorship was entitled to rely on the proprietorship's earlier use of the mark; the proprietorship and the corporation constituted a single enterprise, where the proprietorship had "ceased doing business" under the

mark upon the formation of the corporation, and the business formerly operated as a proprietorship "was taken over and continued by" the corporation).

In *Accu Personnel*, the Board explained as follows:

> This is not a case where two separate commercial enterprises are in existence on the application filing date, and the application is filed by the wrong one. Rather, there has been only one commercial enterprise in existence throughout the life of this application. The Florida corporation named as applicant, although not in existence on the filing date, is merely a later manifestation of the same, single commercial enterprise which filed the application. It is not a separate commercial enterprise, but rather the same enterprise, albeit in corporate form. The four regional companies were transformed into the corporation; they did not survive the merger as entities separate and apart from the corporation.

*Accu Personnel, supra*, 38 USPQ2d at 1445.

Although the actual legal issues involved in *Accu Personnel* (the "personhood" of a yet-to-be formed corporation) and in *Gaylord* (Section 2(d) priority) are different from the Section 1(a) ownership issue involved in the present case, we deem the Board's discussion in both cases of the "single enterprise" theory to be instructive. Indeed, it is the Board's discussion of that theory for which respondent cites both cases in its brief in this case. However, we find that even aside from the differences in the actual legal issues involved in *Accu Personnel* and *Gaylord* vis-à-vis the present case, both of those cases are readily

distinguishable from our case on their facts with respect to the "single enterprise" issue.

Specifically, we find that this case in fact is a case such as that contemplated by the Board in the above-quoted language from *Accu Personnel*, i.e., it is "a case where two separate commercial enterprises are in existence on the application filing date, and the application is filed by the wrong one." In *Accu Personnel*, the four companies which merged after the filing date of the application to form the applicant corporation did not survive the merger as separate entities, so the four companies and the corporation were merely earlier and later manifestations of the same, single commercial entity. Likewise in *Gaylord*, because the earlier proprietorship had ceased to exist or function upon formation of the corporation, the proprietorship and the corporation were deemed to constitute a single, continuing entity.

In our case, however, the '410 corporation and the applicant '660 corporation were not merely earlier and later manifestations of the same, single commercial enterprise. The earlier '410 corporation clearly did not cease to exist upon formation of the '660 corporation, but rather continued in business and continued to use the mark. There is no evidence of any transfer of rights and goodwill in the mark from the earlier '410 corporation to the applicant '660

17

corporation upon the latter's formation.  As of the application filing date, the '410 corporation and the '660 corporation constituted two separate legal entities, and the application was filed by the wrong one.

This case thus is more similar to those reported cases in which the application was found to be void ab initio because two entities were in existence as of the application filing date, and the application was filed by the wrong one. *See, e.g., Huang v. Tzu Wei Chen Food Co. Ltd., supra* (application filed by individual void where owner of mark was corporation with which individual was affiliated); *In re Tong Yang Cement Corp.*, 19 USPQ2d 1689 (TTAB 1991)(application filed by corporation void where owner of mark was joint venture of which applicant corporation was member); and *American Forests v. Sanders,* 54 USPQ2d 1860 (TTAB 1999)(intent-to-use application filed by individual void where the actual entity possessing the bona fide intention to use the mark was a partnership comprised of the individual and her husband).

The present case is particularly similar on its facts to *Daltronics, Inc. v. H.L. Dalis, Inc.,* 158 USPQ 475 (TTAB 1968).  In *Daltronics*, like in the *Gaylord* case relied on by respondent herein and discussed above, the issue was priority.  The opposer, Daltronics, Inc., attempted to rely for priority purposes on the earlier use of a similar mark

by another, earlier-formed corporation, Deltronics Inc.,
which opposer argued was a predecessor in interest to the
later-formed Daltronics, Inc.  The same individual was the
president and sole stockholder of both corporations, and he
treated both companies as his alter egos.  However, there
was no evidence that any transfer of assets or goodwill from
the earlier corporation, Deltronics Inc., to the later-
formed corporation, Daltronics, Inc., had occurred upon the
latter's formation.  The Board held that the earlier
corporation, Deltronics Inc., was not a predecessor in
interest to the opposer, Daltronics, Inc., and that
Daltronics, Inc. therefore was not entitled to rely on the
earlier use of the mark by Deltronics Inc.  The Board
explained as follows:

> However, these two companies had different legal
> existences, and when opposer was organized there
> was no transfer of any good will or rights in the
> mark or name.  Opposer's president conceded that
> there was no transfer of assets; that he
> intentionally formed a new and different
> corporation to make a "clean start" rather than
> change the name which he knew he could do; and
> that he knowingly created a new and, in substance,
> a distinctly different legal entity.  Although he
> treated these companies as his alter egos, we
> cannot conclude on the record before us that the
> use of "DELTRONICS" by the first corporation
> inured to the benefit of opposer.

158 USPQ at 479, n.2.

Although the issue in *Daltronics* (as in *Gaylord, supra*)
was priority, we deem the Board's discussion of the "single

19

enterprise" issue to be relevant to the Section 1(a) ownership issue involved in the present case. As was the case in *Daltronics*, in our case Mr. Matta could have merely changed the name of the '410 corporation from Premier Entertainment, Inc. to Great Seats, Inc. prior to the application filing date, leaving only the one corporation in existence to be the owner of the mark and proper applicant. No such name change occurred until July 7, 1997, well after the application filing date. Instead of merely changing the name of the '410 corporation prior to the application filing date, Mr. Matta formed the new '660 corporation, an entity separate and distinct from the earlier '410 corporation. There was no transfer of rights in the mark from the '410 corporation to the new '660 corporation prior to the application filing date.[6] It therefore was the '410 corporation, not the '660 corporation, that was the owner of the mark as of the filing date.

Even though Mr. Matta, like the individual principal in *Daltronics*, may have treated both corporations as his alter

---

[6] As discussed above at footnote 1, there is of record a nunc pro tunc assignment of the mark from the '660 corporation to the '410 corporation, said to be effective October 7, 1999. This assignment, even assuming it is valid, does not aid respondent in defending against petitioner's Section 1(a) non-ownership claim. The nunc pro tunc assignment is too late (with an effective date after the April 21, 1997 application filing date). More importantly, it transfers the mark in the wrong direction, i.e., from the '660 corporation (which was not the owner of the mark on the application filing date and thus had nothing to transfer) to the '410 corporation (the owner of the mark as of the application filing date), rather than vice versa.

egos, the '410 corporation's use of the mark prior to the filing date did not constitute use of the mark by the '660 corporation, a separate and distinct legal entity. Moreover, even though Mr. Matta may have always believed that he had only one ticket brokerage company throughout, i.e., the '410 corporation which began in 1990 as Wholesale Tickets, Inc., then changed its name to Premier Entertainment, Inc., and then changed its name again (after the application filing date) to Great Seats, Inc., the fact remains that there were two separate corporations in legal existence as of the application filing date, the '410 corporation and the '660 corporation.

In view thereof, and because there was no transfer of rights in the mark from the '410 corporation to the applicant '660 corporation prior to the application filing date, the owner of the mark and the proper applicant was the '410 corporation, not the '660 corporation. Again, this is not a case (such as *Accu Personnel* and *Gaylord*, upon which respondent relies) where there existed only one legal entity as of the filing date which was merely misidentified or misnamed in the application, a curable defect. Rather, there were two legal entities in existence, and the application was filed by the wrong one, a defect which cannot be cured and which renders the application void ab initio.

For all of the reasons discussed above, we are not persuaded by respondent's contention that the applicant '660 corporation and the separate '410 corporation constituted a single continuing commercial enterprise which was in fact the owner of the mark as of the application filing date but which was merely misidentified in the application. As of the application filing date, the owner of the mark and thus the proper applicant for registration was the '410 corporation, not the separate and distinct '660 corporation. These two separate entities were in existence on the filing date, and the application simply was filed by the wrong one.

Respondent's second theory, discussed in its brief somewhat in passing and presumably in the alternative to its "single entity" theory, appears to based on the "related company" provisions of Trademark Act Sections 5 and 45, 15 U.S.C. §§1055 and 1127. Although respondent's argument on this point is far from clear, we presume that respondent is contending that even if the '410 corporation and the applicant '660 corporation were two separate entities as of the April 21, 1997 application filing date, they nonetheless were related companies, such that the '410 corporation's use of the mark between the March 12, 1997 formation of the '660 corporation and the April 21, 1997 application filing date inured to the benefit of the applicant '660 corporation,

22

thus entitling the '660 corporation to file the application as owner of the mark.  We are not persuaded.

Trademark Act Section 5, in pertinent part, provides that "[w]here a registered mark or a mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant or applicant for registration, and such use shall not affect the validity of such mark or of its registration, provided such mark is not used in such manner as to deceive the public."  Trademark Act Section 45 in turn defines "related company" as follows:  "The term 'related company' means any person whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used."

Pursuant to these provisions, to establish that the '410 corporation was a "related company" with respect to the applicant '660 corporation, respondent must show that as of the April 21, 1997 application filing date, the applicant '660 corporation (which was formed on March 12, 1997) controlled the '410 corporation's use of the mark with respect to the nature and quality of the services rendered under the mark.  We find that no such showing has been made.

To be clear, the issue is not whether the '410 corporation was a related company of Mr. Matta as an

individual, or whether an application filed by Mr. Matta based on use by the '410 corporation might have been a valid application under the "related company" doctrine.[7] Rather, the issue is whether the '410 corporation was a related company with respect to the applicant '660 corporation. The '660 corporation, not Mr. Matta as an individual, was the applicant for registration of the mark.

Danny Matta was the president of both the '410 corporation and the '660 corporation. Although the record is far from clear on this point, it also appears that Mr. Matta was the controlling (although apparently not the sole) shareholder of both corporations. Finally, the record shows that the two corporations shared the same premises. However, it is settled that these points of commonality between two corporations do not suffice to make the corporations related companies under Trademark Act Section 5. *See Beech Aircraft Corp. v. Lightning Aircraft Co. Inc.*, 1 USPQ2d 1290 (TTAB 1986); *In re Raven Marine, Inc.*, 217 USPQ 68 (TTAB 1983); and *L. & C. Hardtmuth, Inc. v. Fabrique Suisse de Crayons Caran D'Ache S.A.,* 123 USPQ 546 (TTAB 1959).

There is no evidence of any license or other arrangement between the '410 corporation and the applicant

---

[7] We make no findings and reach no conclusions on the question of whether Mr. Matta might have been a proper applicant for registration of the mark on April 21, 1997.

'660 corporation by which the latter controlled the former's use of the mark with respect to the nature and quality of the services rendered under the mark. The mere fact that Mr. Matta may have controlled both corporations does not suffice to establish that the applicant '660 corporation, itself, controlled the '410 corporation's use of the mark. On this record, we find that any such control by Mr. Matta over the '410 corporation's use of the mark was exercised by Mr. Matta either in his capacity as principal executive officer of the '410 corporation itself, or in his individual capacity as owner of both corporations. There is no evidence that Mr. Matta's control over the '410 corporation was exercised in his capacity as an officer of the applicant '660 corporation. *See Raven Marine, Inc., supra*;[8] *In re Pharmacia Inc*., 2 USPQ2d 1883 (TTAB 1987)(mere fact that two sister corporations (one of which was the applicant for registration and the other of which was the user of the mark) are both controlled by a third corporation does not make the two sister corporations related companies under Section 5; no evidence that the applicant corporation itself

---

[8] "Applicant's proofs, in the Board's view, are no more than an assertion that this principal stockholder/executive superintends the use of the 'THE RAVEN FLEET' marks by Transocean as principal executive officer of Transocean (which would be in the normal course of duty for such a functionary) or in his personal capacity as owner of both corporations rather than as an officer of and through the applicant. At the very least, such proofs are highly ambiguous as to the control and supervision actually exercised by applicant, the corporate owner of the marks." *In re Raven Marine Inc., supra*, 217 USPQ at 70.

controlled the user corporation's use of the mark); *see also*
*The Greyhound Corp. et al. v. Armour Life Insurance Co.*, 214
USPQ 473 (TTAB 1982).

Thus, to the extent that respondent is arguing that the
applicant '660 corporation and the '410 corporation were
related companies under Section 5, such that use of the mark
by the '410 corporation between the March 12, 1997 formation
of the '660 corporation and the April 21, 1997 application
filing date inured to the '660 corporation's benefit, we
find that such argument is not supported by the record.  The
record is devoid of evidence sufficient to establish that
the '660 corporation, itself, controlled the '410
corporation's use of the mark with respect to the nature and
quality of the services rendered under the mark.

One other case upon which respondent relies requires
discussion, i.e., *In re Hand,* 231 USPQ 487 (TTAB 1986).
That case might be read to address both the "single entity"
theory and the "related company" theory asserted by
respondent herein.  Respondent cites *Hand* for the Board's
statement therein (which itself was based on language in
*Smith v. Coahoma Chemical Co. Inc.,* 264 F.2d 916, 121 USPQ
215 (CCPA 1959)) that "if facts were presented to show that
an individual ownership of a corporation was so complete
that the two legal entities 'equitably constituted a single
entity,' then sufficient control by the individual with use

26

by the corporation inuring to the individual's benefit would be found." *In re Hand, supra*, 231 USPQ at 488. We find, however, that this "equitably constituted a single entity" language is dicta, and that it is inapposite to our case in any event.

Notwithstanding the Board's passing reference to a potential situation where an individual and a corporation might be found to have "equitably constituted a single entity,"[9] the issue in *Hand* was a narrow one of ex parte examination procedure involving an individual applicant's claim of ownership of the mark by virtue of use by a Section 5 "related company." The Board held that the examination practice which allows or requires the examiner to accept without further question the claim by a corporate applicant that the mark is used by a wholly-owned related company must also be applied in cases where the applicant is an individual rather than a corporation. The Board specifically stated that it was not addressing the issue of whether the individual applicant in fact was the owner of the mark and thus the proper applicant for registration under Section 1. Rather, "[t]his decision only holds that,

_____

[9] As to whether an applicant for registration who holds merely an "equitable" right to the mark is eligible to file the application as owner of the mark, see *Smith International, Inc. v. Olin Corp.*, 209 USPQ 1033 (TTAB 1981)(even though applicant might be deemed to have "an equitable interest or right" in the mark by virtue of a patent license agreement covering the goods, applicant had no "legal interest or right of ownership" in the

27

in an ex parte prosecution context, the claim by applicant of ownership of a mark through use by a wholly-owned related company with no information present which is inconsistent with said claim must be treated the same whether that applicant is an individual, corporation or some other entity." *Id.*, at n.2. That narrow examination issue is not present in the inter partes case before us.

Moreover, *Hand* is distinguishable because in our case the applicant for registration was not Mr. Matta as an individual, who may or may not have been eligible to claim ownership of the mark under Section 5 due to his control over the '410 corporation. Rather, the applicant for registration was the '660 corporation, a separate and distinct legal entity which exercised no control over the '410 corporation's use of the mark.

In summary, we find that the applicant '660 corporation and the '410 corporation did not constitute a single entity but rather were two distinct entities as of the application filing date, and that the '410 corporation's use of the mark therefore cannot be deemed to be use by the '660 corporation itself. Cases like *Accu Personnel, supra*, cited by respondent, therefore are distinguishable. We also find that the two corporations were not Section 5 related companies due to the lack of control by the '660 corporation

mark as of the application filing date, rendering the application

28

over the '410 corporation's use of the mark, and that the '410 corporation's use therefore did not inure to the benefit of the applicant '660 corporation under Section 5. We conclude that, under either theory posited by respondent, the applicant '660 corporation was not the owner of the mark as of the application filing date, and that the application it filed therefore is void ab initio under Section 1(a).

**RESPONDENT'S UNCLEAN HANDS DEFENSE**

Respondent has asserted the affirmative equitable defense of "unclean hands." This defense has to do with what respondent deems to be petitioner's alleged violations of New York State statutes forbidding ticket scalping. Respondent argues (brief at 22-23) that "[s]uch conduct is directly related to Petitioner's claim of priority of use in this proceeding. Because the claimed sales under the alleged mark and the use of the claimed mark violates New York law, Petitioner should not be permitted under the doctrine of unclean hands to rely on unlawful use to establish priority."

We need not and do not decide the merits of respondent's "unclean hands" defense. Respondent itself notes that the defense goes to the issue of petitioner's Section 2(d) priority claim. As noted above (at footnote 3)

---

void.

petitioner has expressly withdrawn its Section 2(d) claim, rendering the issue of priority moot in this case.[10] In view thereof, we give no consideration or effect to respondent's unclean hands affirmative defense.

**CONCLUSION**

After careful consideration of all of the evidence of record pertaining to petitioner's Section 1(a) ownership ground for cancellation, as well as the parties' arguments with respect thereto, we conclude that the application which matured into the registration involved in this proceeding is void ab initio because it was not filed by the owner of the mark. We therefore grant the petition to cancel on that ground. We do not reach petitioner's pleaded fraud claim. We reject respondent's unclean hands affirmative defense.

Decision: The petition to cancel is granted.

---

[10] Also, as discussed *supra*, petitioner's standing to petition to cancel respondent's registration is established by petitioner's ownership of an application which has been refused registration based on respondent's involved registration. Respondent's defense of unclean hands, even if it were to be established, does not deprive petitioner of standing.